```
              UNITED STATES DISTRICT COURT
                DISTRICT OF NORTH DAKOTA
                   NORTHEASTERN DIVISION
```

Juan Garcia, Jr.,                )
                                 )
          Plaintiff,             )
                                 )
     v.                          )      Case No. 2:05-cv-50
                                 )
Wayne Schull, Russell Kraft,     )
Linda Wagner, and Gary Gardner,  )
                                 )
          Defendants.            )

## Memorandum Opinion and Order

The Defendants have moved for a summary judgment against the Plaintiff Juan Garcia in his excessive force and unconstitutional conditions of confinement action under 42 U.S.C. § 1983 (doc. #34). The Defendants argue that Garcia cannot present evidence sufficient to meet the elements of his claims, that the Defendants are immune from suit for their actions, and that Garcia failed to exhaust his administrative remedies on the confinement claim as required under the Prisoner Litigation Reform Act ("PLRA"). The Court **GRANTS** the Defendants' motion, concluding that Defendants Wayne Schull and Russell Kraft have qualified immunity on the excessive force claim and that Garcia did not properly exhaust his confinement administrative remedies.

## I.   Facts

On May 21, 2004, Grand Forks police arrested Garcia. The arrest followed a six-hour standoff in which Garcia barricaded himself in an apartment building garage. Earlier that day,

1

Garcia had been walking on a sidewalk when Grand Forks police officers noticed him.  Garcia had at least one outstanding arrest warrant for aggravated assault.  Garcia began to run, and he ran to the apartment garage in which he barricaded himself.

The Grand Forks Police Department Special Enforcement Team responded to the scene.  Defendants Russell Kraft and Wayne Schull were officers with that team.  During the standoff, police officers deployed a light-sound diversionary device in the garage adjacent to the garage in which Garcia was barricaded.  Garcia began negotiating, but negotiations stalled.

Officers then prepared to forcibly remove Garcia from the garage.  Officers deployed another light-sound diversionary device in the adjacent garage and released two tear gas grenades into Garcia's garage through a hole in the wall between his garage and the adjacent garage.[1]  The officers could not enter the garage through the door because Garcia had jammed it, so they removed the drywall in the garage adjacent to Garcia's garage and entered through the wall.  Once inside, the officers opened the jammed door and discovered Garcia inside a car in the garage.  They believed Garcia was possibly armed.[2]  Police broke a hole in one of the car windows and sprayed Garcia with two shots of OC spray.  Garcia then stepped out of the car.

---

[1] The second grenade was deployed because the first had not worked properly.

[2] Police later found knives in the garage.

2

A local news crew filmed Garcia exiting the garage.  The video shows Garcia walking out of the garage with his arms raised and hands open.  However, as soon as Garcia was out of the garage, he clinched his fists and began lowering his arms.  Two officers immediately grabbed Garcia and tried to take him to the ground.  Garcia resisted their attempts, struggling to push himself upright.  Finally, Garcia fell face first to the ground, which Garcia contends caused gravel to be imbedded in his face and ear.  The officers then attempted to move Garcia's hands to his back for handcuffing, but Garcia resisted this also, trying to force his hands under his chest.  Officer Schull stated in his affidavit that he believed Garcia might still be armed and a danger to the officers (doc. #42).[3]  The video shows Schull striking Garcia's right shoulder blade four times.  Schull stated in his affidavit the blows were intended to strike a motor-control point to disrupt Garcia's control of his arm, allowing the officers to pull Garcia's arm to his back (doc. #42).  Finally, the officers handcuffed Garcia.  The video shows that when the officers began escorting Garcia to a police car, Garcia again tried to jerk away from the officers, although the attempt is not very strong.  Garcia claims Schull's and Kraft's actions of taking him to the ground and striking him during handcuffing was excessive force.

---

[3] Garcia admitted to having a pocket knife on him during the arrest.  Garcia Deposition at 21.

3

After receiving medical treatment at the local hospital, Garcia was taken to the Grand Forks County Correctional Center ("Correctional Center"). Defendant Gary Gardner was the Administrator of the Correctional Center when Garcia was incarcerated. Defendant Linda Wagner was the Captain of the Correctional Center. Garcia was initially put in a solitary holding cell, because the Correctional Center personnel believed he was suicidal. On June 10, 2004, Correction Center personnel placed Garcia in general population. Garcia claims that while incarcerated at the Correctional Center, he did not receive proper medical treatment he claims he needed as a result of injuries received during his arrest. He also contends he was held in the holding cell for an unreasonably long period of time, the holding cell was cold and unsanitary, and he was denied adequate clothing, linens, and recreation.

While incarcerated at the Correctional Center, Garcia filed two grievances. The first complained that a heat pack he used for therapy was not returned to him for an unreasonable length of time. The second alleged he was not given medical attention or medication when he requested it. The Correctional Center's grievance policy required Garcia to give a written grievance to the immediately responsible corrections officer. The immediately responsible corrections officers rejected both claims. The grievance procedure's next level required sending a written grievance to Captain Wagner. The third level of the grievance procedure required sending a written grievance to Administrator

4

Gardner.  The final level of the procedure was a written appeal to the Grand Forks County Commission.  Neither party disputes that Garcia did not follow the Correctional Center's formal grievance procedure past the initial stage.

In April 2005, Garcia sued, in their individual capacities, Officers Schull and Kraft for excessive force and Administrator Gardner and Captain Wagner for the conditions of his confinement.  The Defendants moved for summary judgment.  Garcia opposes this motion, arguing he has presented genuine issues of material fact and should be allowed to proceed to trial.

**II.  Discussion**

    **A.   Excessive Force**

Defendants Schull and Kraft argue the doctrine of qualified immunity shields them from Garcia's excessive force claim.  "Qualified immunity shields police officers from liability for civil damages where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Under the Supreme Court's qualified immunity test, the Court must decide if the facts, examined in a light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if that prong is met does the Court

5

analyze the second prong: was the constitutional right clearly established. Id.

Excessive force claims arising from an arrest are analyzed under the Fourth Amendment's "objective reasonableness" standard, not substantive due process. Graham v. Connor, 490 U.S. 386, 395 (1989). Because many arrests carry a degree of physical coercion, the Court must balance the plaintiff's Fourth Amendment intrusion against the governmental interests at stake to decide whether a violation of the constitutional right has occurred. Id. at 396. The Court must carefully analyze the facts of the case, including (1) the severity of the crime, (2) the immediate threat to officers, and (3) whether the plaintiff resisted arrest or attempted to evade the officers. Id.; see also Wertish, 433 F.3d at 1066-67 (applying the Graham factors). While examining the facts in a light most favorable to the plaintiff, the Court's vantage point is that of a "reasonable officer on the scene," not 20/20 hindsight. Graham, 490 U.S. at 396. This vantage point recognizes that law enforcement officer must often make immediate decisions in tense situations. Id. at 397.

This case is unlike most cases this Court has seen, because the record includes a video recording of the actual arrest and alleged excessive force filmed by a neutral third party. The video begins six hours after the affair began with police extracting Garcia from a garage. Garcia was wanted for aggravated assault. Under Graham, this is a severe crime, and the police had to proceed assuming Garcia was a dangerous man.

Police had attempted to draw Garcia out of the garage by using negotiation and diversionary tactics. These tactics had not worked, so police entered a dark and smoky garage through a hole they had to make, not knowing if Garcia was armed. When police finally opened the garage and removed Garcia from the vehicle, they had not yet had an opportunity to fully assess if he was armed or otherwise dangerous. The video shows that the moment Garcia came out of the shadows of the garage, he clinched his fists and began lowering his arms. This is an intimidating action in any light. Therefore, reasonable police officers, knowing Garcia could still be armed and having clinched his fists, would perceive themselves to still be in danger and needed to immediately react. Therefore, the officers were justified when they grabbed Garcia to secure and handcuff him.

After Garcia was taken to the ground, officers attempted to handcuff him. The video shows Garcia struggling with officers and trying to lay on his hands with his chest to inhibit the officers from handcuffing him. The reasonable officer would see Garcia's actions as resisting arrest, and he or she would be justified in using some physical coercion to handcuff Garcia. Once he was handcuffed and the officers were escorting him to a police car, Garcia again tried jerk away from the officers. The reasonable officer would see Garcia's struggle as a continued attempt to resist arrest after he had resisted arrest for six hours, justifying the use of more force than would be applied in

7

a peaceful arrest.  Although Garcia now contends he was surrendering, his conduct is not that of a defeated man.

Garcia was wanted for a serious crime, the officer reasonably saw him and his conduct as a safety threat, and he resisted arrest by locking himself in the garage and struggling with officers while they were handcuffing him.  Because the officers acted reasonably when arresting Garcia, his Fourth Amendment rights have not been violated.  No further analysis is needed under Saucier.  Qualified immunity shields Defendants Schull and Kraft from liability.

**B.   Conditions of Confinement**

Neither party disputes that Garcia did not follow the Correctional Center's formal grievance procedure past the initial stage.  The Defendants argue Garcia has not exhausted his administrative remedies.  Garcia argues, however, that his continual complaining to Correctional Center officers sufficiently complies with the PLRA exhaustion requirement.

The PLRA requires a prisoner[4] exhaust the administrative remedies available to him or her before bringing a claim under section 1983:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

---

[4] The PLRA defines prisoner to include someone accused of a crime, and thus, includes pretrial detainees.  42 U.S.C. § 1997e(h).

42 U.S.C. § 1997e(a).

In Woodford v. Ngo, the Supreme Court addressed the issue of whether a procedurally defective grievance satisfied the exhaustion requirement. 126 S. Ct. 2378, 2382 (2006). The prisoner had filed a grievance while in prison, but the grievance was rejected because it was not timely filed. Id. at 2384. The Court compared the PLRA exhaustion requirement to the administrative law doctrine of proper exhaustion. Id. at 2385-86. Proper exhaustion requires the litigant to fully and properly exhaust all administrative level remedies before filing suit, rather than failing to follow procedural requirements such as missing deadlines. Id. at 2386. The Court held the PLRA required proper exhaustion because without it, a prisoner would have little incentive to comply with the requirement. Id. at 2388. A prisoner could avoid administrative remedies by intentionally filing a procedurally faulty grievance, thus making the administrative remedies no longer available to him. Id.

Recently, the Supreme Court issued its opinion in Jones v. Bock, ___ S. Ct. ___, Nos. 05-7058, 05-7142, 2007 WL 135890 (2007). In Jones, the Court concluded three Sixth Circuit Court of Appeals procedural rules exceeded the limits of the Sixth Circuit's judicial authority. Id. at *3. The Court specifically held that the PLRA exhaustion requirement is an affirmative defense, and prisoners are not required to specially plead or prove exhaustion in their complaint, id. at *11; that PLRA exhaustion does not require every defendant named in the

9

complaint be named in the initial grievance, id; and that when a PLRA suit contains both exhausted and unexhausted claims, only the unexhausted claims should be dismissed, id. at *14.  However, the Court did not modify its rule regarding proper exhaustion:

> In Woodford, we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules,"--rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust."  The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

Id. at *12 (internal citation omitted).  Therefore, Garcia must have fully and properly complied with the Correctional Center grievance procedures before his PLRA suit may proceed.

Garcia filed two grievances with Correctional Center staff.  One complained the heat pack he used for therapy was kept from him for an unreasonable time.  The other claimed he was not receiving proper medical attention.  Neither of these grievances were appealed to Captain Wagner.  Furthermore, Garcia filed no grievances related to his cell conditions, the period of solitary confinement, or the adequacy of his clothing, linens, and recreation.  The Correctional Center's grievance procedure was not difficult, requiring a simple form be filled out and addressed up the chain of command until it reached the Grand Forks County Commission.  These procedures were not met.  Therefore, under the PLRA and Woodford, Garcia has failed to

10

exhaust his administrative remedies on any of his claims, and his conditions of confinement action may not proceed.

Garcia argues he substantially complied with the grievance procedures by continually complaining to Correctional Center staff.  However, Woodford does not allow for substantial compliance; it requires proper exhaustion.  Therefore, his argument is without merit

### III. Conclusion

Garcia has not shown the actions of Officers Schull and Kraft violated his Fourth Amendment rights.  Garcia also failed to exhaust the administrative remedies available to him at the Correctional Center.  Therefore, the Court **GRANTS** the Defendants' Motion for Summary Judgment.  Garcia's case is **ORDERED DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Dated this 29th day of January, 2007.

/s/ Rodney S. Webb
RODNEY S. WEBB, District Judge
United States District Court